# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| MATTHEW FOLDI, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. 8:23-cv-3089-PX |
| BOARD OF EDUCATION | * | |
| FOR MONTGOMERY COUNTY, *et al.*, | | |
| | * | |
| Defendants. | * | |

***

## MEMORANDUM OPINION

Plaintiffs Matthew Foldi and Bethany Mandel sue the Board of Education for Montgomery County (the "School Board"); the School Board members (the "Board Members")[1]; the former Superintendent of Montgomery County Public Schools ("MCPS"), Monifa McKnight[2]; and the MCPS staff who manage the "@MCPS_StaffPRIDE" X account (the "Pride Members")[3] for allegedly restricting Plaintiffs' access to an in-person School Board meeting and blocking Mandel from the Pride Members' "X" account, in violation of their First Amendment rights and the Open Meetings Act, Md. Gen. Provis. § 3-101 *et seq.* ECF No. 1. Pending is Defendants' motion to dismiss the Complaint. ECF No. 35. The issues are fully briefed, and no hearing is necessary. *See* Loc. R. 105.6. For the following reasons, the motion is granted in part and denied in part.

---

[1] The Board Members are Karla Silvestre, Brenda Wolff, Grace Rivera-Oven, Shebra Evans, Lynne Harris, Julie Yang, and Rebecca Smondrowski. ECF No. 1 ¶ 6.

[2] Monifa McKnight resigned as the Superintendent in early 2024. *See* Nicole Asbury, *Ex-Montgomery superintendent McKnight to get $1.3M in separation deal*, The Washington Post (Mar. 15, 2024, 11:18 p.m.), https://www.washingtonpost.com/education/2024/03/15/mcknight-separation-agreement-montgomery-county-schools/.

[3] The Pride Members are Elicia Eberhart-Bliss, Gwen Filipiak, Chris Knocke, Kristi Licare, Shaun Sawko, and Holly Van Puymbroeck. ECF No. 1 ¶¶ 16, 20, 24, 28, 32, 36.

## I.      Background[4]

Foldi and Mandel live in Montgomery County, Maryland.  ECF No. 1 ¶¶ 3, 4.  Foldi writes for a news magazine, The Spectator, and Mandel is a columnist for several national publications and has written extensively on education and parental rights.  *Id.*  In October 2022, the School Board announced the introduction of LGBTQIA+-themed books into the MCPS curriculum.  *Id.* ¶ 45.  In response, several parents sought permission from MCPS for their children to "opt out" of any classroom instruction involving these books.  *Id.* ¶ 46.

At first, it appeared that MCPS would permit this opt-out alternative.  *See* ECF No. 1 ¶ 47.  On March 22, 2023, MCPS confirmed that parents could choose to have their children read other material in lieu of the LGBTQIA+ books.  *Id.*  But the next day, the School Board reversed course and informed parents that no such opt-out alternative would be available, nor would MCPS notify parents when classroom instruction would involve LGBTQIA+-themed materials.  *Id.* ¶ 48.

### A.      School Board Meetings

The question of LGBTQIA+-inclusive reading materials became a hot button issue for MCPS.  *See, e.g.*, ECF No. 1 ¶¶ 49, 50, 52, 53.   At a March 2023 School Board meeting for example, one parent vocally opposed the Board's refusal to provide an opt-out alternative to parents on behalf of their children.  *Id.* ¶ 49.  In response, Board Member Harris challenged the protestor, publicly announcing that the parent's position "is just telling that kid, 'here's another reason to hate another person.'"  *Id.* ¶¶ 49–50.

---

[4] These facts are derived from the Complaint and construed most favorably to Plaintiffs.  *See Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).

Over the next few months, the debate over the propriety of the opt-out alternative intensified, and in advance of a June 6, 2023, School Board meeting, "scores of parents and community members" gathered in peaceful protest outside of the MCPS Carver Educational Services Center ("Carver Center"), where the meeting was being held.  ECF No. 1 ¶ 55.  Also at the June 6th meeting, a female Muslim student attested to her discomfort with being made to read LGBTQIA+ books that ran contrary to her religious beliefs, to which Board Member Harris said she "felt kind of sorry" for the student, and opined about whether the student was "parroting [the] dogma" of her parents.  *Id.* ¶ 57.

Predictably, these exchanges were the subject of ever-increasing media attention.  ECF No. 1 ¶¶ 51, 58.  Plaintiffs, in turn, planned to attend the next School Board meeting in person to oppose the use of LGBTQIA+-themed books and the denial of an opt-out alternative.  *Id.* ¶ 59.  Parents also planned to rally at the meeting to support an opt-out policy.  *Id.* ¶ 60; *see* Em Espey, *More protests planned at MCPS headquarters over LGBTQ+ inclusive books*, MoCo360 (June 16, 2023, 9:03 a.m.), https://bit.ly/47bMhMy.

MCPS scheduled the next School Board meeting for June 27, 2023, and published the agenda a week in advance.  *See* ECF No. 1 ¶¶ 61, 98.  The agenda made clear that the opt-out policy would be discussed during the open portion of the meeting.  *See id.*  Because the School Board anticipated a healthy turnout for the meeting, it decided to limit the number of people who would be admitted into the physical meeting space.  *See id.* ¶ 62.  MCPS explained:

> Because of the interest in the upcoming Board of Education meeting on Tuesday, June 27, the following safety measures will be implemented. Access to the Carver Educational Services Center building . . . will be limited to scheduled speakers and invited attendees. The parking lot on the east side of the building is the designated area for any large group gatherings. We remind you that all public Board of Education meetings can be viewed online at the district website, the MCPS-TV YouTube channel and on MCPS-TV.

*Id.*; *see* Montgomery County Public Schools, *Public Access Safety Message Concerning CESC for June 27*, Montgomery County Public Schools (June 26, 2023), https://bit.ly/3QF5WyT.

On June 27, 2023, the open portion of the School Board meeting began at 3:38 p.m. and ended at 9:00 p.m.  ECF No. 1 ¶¶ 63–64.  Only people who had signed up to attend the meeting and scheduled speakers were allowed into the Carver Center.  *Id.* ¶ 65.  However, people could observe the entirety of the meeting online.  *See id.* ¶ 62.  The School Board also provided a designated area for assembly on the Carver Center premises for anyone who was denied admission into the center itself.  *See id.* ¶¶ 62, 66.

Neither Foldi nor Mandel had signed up in advance to speak at the meeting, nor were they invited guests.  *See* ECF No. 1 ¶¶ 65, 67.  So even though Foldi identified himself as a member of the press and asked to attend the meeting in person, he was turned away.  *Id.* Plaintiffs instead joined hundreds of parents and community members in the designated area to assemble and protest.  *See id.* ¶ 66.

**B.      @MCPS_StaffPRIDE X Account**

MCPS staff also engage in online discourse about LGBTQIA+ related issues through an "@MCPS-StaffPRIDE" X account (the "Pride Account").[5]  The Pride Account, managed by the Pride Members, describes itself as "[a] safe, affirming professional & social network for MCPS staff who identify as part of the LGBTQIA+ community," that offers "[r]esources and reminders for MCPS schools & offices."  ECF No. 1 ¶ 71.  The Pride Account shares LGBTQIA+-themed educational content, events, and announcements with the MCPS community.  *See id.* ¶ 75.  It is open to the public, allowing online readers to "reply," "like," "dislike," or "share" information posted to the account.  *Id.* ¶¶ 74–75.

---

[5]  After the filing of the lawsuit, the Pride Members changed the Pride Account's X handle to "@PRIDEducators."  ECF No. 42 at 8 n.2.

The Pride Account is also connected to MCPS via the MCPS website.  *See* ECF No. 1 ¶ 73.  The website includes a link to a "Staff Affinity Page," which, in turn, links to the Pride Account.  *Id.*  Users can join the Pride Account only by emailing the Pride Members at their official MCPS email addresses.  *Id.* ¶ 72.  And such email addresses, MCPS makes clear, are to be used only for work related "[p]rofessional social media" activities.  *See* Montgomery County Public Schools, *Social Media Best Practices for Employees*, https://bit.ly/3Mv7d9l (last visited Sept. 11, 2024) (hereinafter "Social Media Best Practices").  MCPS further advises that for professional social media activity and "[i]n alignment with recent court decisions, MCPS employees posting to social media in a professional capacity should not block users or delete comments on their own initiative."  ECF No. 1 ¶ 78; *see* Social Media Best Practices.

From November 2022 to June 2023, Mandel, through her X account, publicly criticized MCPS' incorporation of LGBTQIA+ books into the curriculum without an opt-out alternative.  ECF No. 1 ¶ 76.  Shortly before the June 27th School Board meeting, the Pride Members blocked Mandel from accessing the Pride Account.  *Id.* ¶ 77.  Mandel can no longer view posts from the account, nor can she share those posts with her commentary.  *Id.*

### C.    Procedural History

On November 13, 2023, Plaintiffs filed a three-count Complaint in this Court.  ECF No. 1.  Count I, brought pursuant to 42 U.S.C. § 1983 and against the Board Members and McKnight, alleges that the restriction on attendance at the June 27, 2023, School Board meeting violated Plaintiffs' First Amendment freedom of association.[6]  ECF No. 1 ¶¶ 81–104.  Count II

---

[6] Although the Complaint suggests that Plaintiffs pursue both free speech and association claims, ECF No. 1 ¶¶ 81–104, Plaintiffs clarified in their response to the motion that they are not pursuing a free speech claim.  ECF No. 42 at 9–10.  This is also consistent with the allegation that Plaintiffs never intended to speak at the June 27, 2023, Board meeting.  *See* ECF No. 1 ¶ 97.

accuses the School Board of violating Maryland's Open Meetings Act, Md. Gen. Provis. § 3-101 *et seq.*, based on the same restrictions. *Id.* ¶¶ 105–11. And in Count III, Mandel alleges that the Pride Members violated her First Amendment free speech rights by blocking her from the Pride Account. *Id.* ¶¶ 112–24.

Defendants now move to dismiss the Complaint on both jurisdictional and sufficiency grounds. ECF No. 35. Because the question of jurisdiction implicates the Court's power to hear the case at all, the Court turns to these arguments first. *See Stop Reckless Econ. Instability Caused by Democrats v. Fed. Election Comm'n*, 814 F.3d 221, 228 (4th Cir. 2016) ("Without jurisdiction the court cannot proceed at all in any cause." (quoting *Ex parte McCardle*, 74 U.S. 506, 514 (1868))); *see also Beyond Sys., Inc. v. Kraft Foods, Inc.*, 777 F.3d 712, 715 (4th Cir. 2015) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88–102 (1998)).

## II. Analysis

### A. Standing as to Prospective Relief (Counts I and II)

Defendants argue that Plaintiffs lack standing to pursue injunctive and declaratory relief in Counts I and II because no Complaint facts make plausible that Plaintiffs face any actual or imminent threat of future restraint on their freedom of association or in-person attendance at future meetings. ECF No. 35-1 at 24, 26. Pursuant to Article III of the United States Constitution, federal courts are ones of limited jurisdiction, hearing only live "Cases" and "Controversies." U.S. Const. art. III, § 2. A party's standing to maintain an action "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Davis v. Fed. Election Comm.*, 554 U.S. 724, 733 (2008) (citations omitted). This "standing requirement applies to each claim that a plaintiff seeks to press." *Overbey v. Mayor of Balt.*, 930 F.3d 215, 230 (4th Cir. 2019) (quoting *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014)). The plaintiff

bears the burden of demonstrating "standing separately for each form of relief sought." *Id.* (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000)).  Where, as here, a defendant asserts lack of standing on a motion to dismiss, the Court construes all complaint allegations as true and most favorably to the plaintiff.  *See David v. Alphin*, 704 F.3d 327, 333 (4th Cir. 2013).

To satisfy Article III standing, the Complaint must make plausible that the plaintiff "(1)[] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth*, 528 U.S. at 180–81.  When the plaintiff seeks declaratory or injunctive relief, the Complaint must additionally allege some facts to make plausible "an *ongoing or future* injury in fact." *Overbey*, 930 F.3d at 230 (emphasis in original) (quoting *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018)).  Historic harms alone cannot give rise to this inference.  *Id.* (citing *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018)).

Viewing the Complaint facts as true, nothing suggests that Plaintiffs risk any future harm of exclusion from School Board meetings akin to what they experienced on June 27, 2023.  *See* ECF No. 1.  At most, Plaintiffs confine the alleged constitutional injury to denial of access on that single day.  *See id.* ¶¶ 59, 62.  Nothing else indicates that they were subsequently denied similar access, or that they would confront future denial.  *See Overbey*, 930 F.3d at 230.  Nor do Plaintiffs even allege any intent on their parts to attend future School Board meetings.  *See* ECF No. 1.

Plaintiffs respond that they need not aver anything more than Defendants' unfettered ability to limit future in-person attendance.  *See* ECF No. 42 at 20–21; ECF No. 1 ¶ 69.  But that

alone does not make plausible that such ability would be exercised.  Simply because Defendants can violate Plaintiffs' rights does not mean they will.  *See Overbey*, 930 F.3d at 230. Defendants' naked ability to limit School Board meeting attendance in the future does not confer on Plaintiffs standing to assert a claim for declaratory or injunctive relief.  *See id.*  Any claims premised on declaratory and injunctive relief in Counts I and II are dismissed.

**B.      Dismissal for Failure to State a Claim (Counts I–III)**

Defendants next lodge a series of attacks on the sufficiency of the claims pursuant to Federal Rule of Civil Procedure 12(b)(6).  *See* ECF No. 35-1.  When reviewing a 12(b)(6) motion, the Court must "accept the factual allegations in the complaint as true and construe them in the light most favorable to the nonmoving party."  *Rockville Cars, LLC v. City of Rockville*, 891 F.3d 141, 145 (4th Cir. 2018).  However, the "Federal Rules do not require courts to credit a complaint's conclusory statements without reference to its factual context."  *Ashcroft v. Iqbal*, 556 U.S. 662, 686 (2009).  Nor can courts "accept as true a legal conclusion couched as a factual allegation."  *Papasan v. Allain*, 478 U.S. 265, 286 (1986); *see Iqbal*, 556 U.S. at 663 (". . . the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements.").  To survive a motion to dismiss, a complaint's factual allegations "must be enough to raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The Court must be able to deduce "more than the mere possibility of misconduct" and the facts of the complaint, accepted as true, must demonstrate that the plaintiff is entitled to relief.  *Ruffin v. Lockheed Martin Corp.*, 126 F. Supp. 3d 521, 526 (D. Md. 2015) (quoting *Iqbal*, 556 U.S. at 679), *aff'd as modified*, 659 F. App'x 744 (4th Cir. 2016).

The Court considers Defendants' sufficiency arguments separately.

1.      **First Amendment Claims:  Official Capacity Suit (Counts I & III)**

Defendants first argue that to the extent a First Amendment claim seeking money damages is for acts performed in a defendant's "official capacity," the claim must be dismissed. ECF No. 35-1 at 16, 34–35.  It is well settled that "[n]either the State, nor its agencies or officials acting within their official capacities, can be sued under § 1983."  *Dennis v. Bd. of Educ. of Talbot Cnty.*, 21 F. Supp. 3d 497, 501–02 (D. Md. 2014) (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70 (1989)); *see also Does 1-22 v. Prince George's Cnty. Bd. of Educ.*, 644 F. Supp. 3d 149, 157 (D. Md. 2022) (dismissing claims against school employees in their official capacities); *Brummell v. Talbot Cnty. Bd. of Educ.*, RDB-22-1601, 2023 WL 7282896, at *6 (D. Md. Nov. 3, 2023) (same); *Doe #1 v. Montgomery Cnty. Bd. of Educ.*, 21-0356 PJM, 2021 WL 6072813, at *8 (D. Md. Dec. 23, 2021) (collecting cases).  Plaintiffs do not meaningfully argue otherwise.  Thus, all official capacity claims for damages are dismissed as to Counts I and III.

2.      **First Amendment Claim:  June 27, 2023, Board Meeting (Count I)**

Defendants next argue that as for the individual capacity claim for money damages, Plaintiffs have failed to make plausible a First Amendment violation arising from the limitation placed on in-person attendance at the June 27, 2023, School Board meeting.  ECF No. 35-1 at 17–22.  To assess the sufficiency of the First Amendment association claim, the Court considers three elements.  *Davison v. Rose*, 19 F.4th 626, 635 (4th Cir. 2021) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985)).  First, whether the complaint plausibly alleges that the claimed conduct was protected by the First Amendment.  *Id.*  Next, the "nature of the forum" in which the claimed violation occurred.  *Id.*  And third, whether the defendant's justifications for the limitation on the plaintiff's First Amendment right "satisfy[ies] the requisite standard" for "exclusion from the relevant forum."  *Id.*

As to the first element, it is well accepted that "implicit in the right to engage in activities protected by the First Amendment [is the] corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984).  "People assemble in public places not only to speak or to take action, but also to listen, observe, and learn; indeed, they may 'assembl[e] for any lawful purpose.'"  *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 578 (1980) (quoting *Hague v. CIO*, 307 U.S. 496, 519 (1939) (opinion of Stone, J.)).  Because Plaintiffs wanted to assemble with likeminded individuals at the School Board meeting regarding the opt-out policy for the LGBTQIA+ curriculum, the Complaint plausibly triggers First Amendment protection.  *See* ECF No. 1 ¶¶ 81–104; *Roberts*, 468 U.S. at 622.

Second, as to the type of forum, this inquiry is grounded in the principle that "[e]ven protected speech is not equally permissible in all places and times."  *Cornelius*, 473 U.S. at 799. Accordingly, depending on the nature of the forum, the government may limit or restrict speech without running afoul of the First Amendment.  *See Rose*, 19 F.4th at 635 (quoting *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001)); *see also White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 196 (4th Cir. 2022) ("the nature of the property determines the permissible scope of government control" (quoting *Cornelius*, 473 U.S. at 800)).

"The three recognized types of fora are the traditional public forum, the nonpublic forum, and the designated or limited public forum."  *Goulart v. Meadows*, 345 F.3d 239, 248 (4th Cir. 2003).  The parties' arguments focus on whether the relevant portions of the meeting took place in a "limited public" or "designated public" forum, and so the Court must spend some time explaining each.  *See* ECF No. 42 at 10; ECF No. 35-1 at 18.

A limited public forum is one which the government has created in a specific location for a limited use, such as when a public-school opens its facility for after-hours club use. *Rose*, 19 F.4th at 635; *see Good News Club*, 533 U.S. at 106. In a limited public forum, the state actor "is not required to and does not allow persons to engage in every type of speech." *Rose*, 19 F.4th at 635 (quoting *Good News Club*, 533 U.S. at 106). But any restriction on protected activity "must be reasonable in light of the purposes served by the forum" and cannot discriminate based on viewpoint. *Id.* (quoting *Child Evangelism Fellowship of S.C. v. Anderson Sch. Dist. Five*, 470 F.3d 1062, 1067–68 (4th Cir. 2006) (citation omitted)).

A designated public forum, by contrast, is more akin to a public forum. A public forum is a public space "traditionally associated with free exercise of expressive activities" like streets, sidewalks, and parks. *White Coat Waste Project*, 35 F.4th at 196 (citing *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992)); *see also Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 555 (1975). Whereas a designated public forum is one which the government earmarks for similar expressive activities, such as a government owned auditorium. *White Coat Waste Project*, 35 F.4th at 196 (citing *Lee*, 505 U.S. at 678). Thus, the designated public forum "follow[s] the same rules" regarding reasonable restrictions on speech and association "as traditional public forums." *Id.*

Undoubtedly, the difference between the fora has sown confusion. *See Child Evangelism Fellowship of S.C.*, 457 F.3d at 382. But in the context of school board meetings akin to this, the Fourth Circuit has consistently treated them as limited public fora. *See Steinburg v. Chesterfield County Plan. Com'n*, 527 F.3d 377, 385 (4th Cir. 2008) (agreeing with parties that the planning commission's public meeting was a "limited public forum"); *see also Rose*, 19 F.4th at 626 (stating because "the school board meetings are limited public fora . . . , the [school board] is

'justified in limiting its meeting to discussion of specified agenda items and imposing reasonable restrictions . . . to further the forum's purpose of conducting business.'" (quoting *Steinberg*, 527 F.3d at 385)).  In such spaces, the government may be justified in "reserving its forum for certain groups or for the discussion of certain topics."  *Rose*, 19 F.4th at 635 (quoting *Good News Club*, 533 U.S. at 106).  However, such restrictions may not limit speech "on the basis of viewpoint," and any restriction must be reasonable in light of the government's stated purpose for imposing it.  *Id.* (quoting *Child Evangelism Fellowship of S.C.*, 470 F.3d at 1067–68 (quoting *Good News Club*, 533 U.S. at 106–07)).

When viewing the Complaint facts most favorably to Plaintiffs, nothing makes plausible an unconstitutional restriction on their First Amendment rights.  *See* ECF No. 1.  Critically, the School Board's limitations on in-person attendees were "without reference to the content" of the speech or type of association.  *Lowery v. Jefferson Cnty. Bd. of Educ.*, 586 F.3d 427, 433 (6th Cir. 2009) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)).  In response to the escalating interest in the introduction of the LGBTQIA+-inclusive books, the School Board anticipated a large crowd for the meeting.  *See* ECF No. 1 ¶¶ 52–53, 55–56, 61.  Accordingly, the Board articulated a facially content neutral limit—only those who signed up in advance or who were invited to speak would be let into the Carver Center.  *Id.* ¶¶ 62, 97.  These criteria alone did not impose any content-based restrictions.  *See id.*  In fact, the majority of in-person speakers at the meeting *opposed* the opt-out policy.  *See* Montgomery County Public Schools, *June 27, 2023 Bus. Meeting Agenda*, https://mcpsmd.new.swagit.com/videos/251141 (last visited Sept. 11, 2024).[7]  By contrast, nothing suggests that the limitation on the number of

---

[7] In reviewing a Rule 12(b)(6) dismissal, [the Court] may properly take judicial notice of matters of public record."  *Philips v. Pitt Cnty. Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (citation omitted).

attendees inside the building had been aimed at Plaintiffs' viewpoint. *See* ECF No. 1; *Rose*, 19 F.4th at 635.

Moreover, no Complaint facts suggest that the stated grounds for limiting the number of attendees was unreasonable. *See Steinburg*, 527 F.3d at 386 (deciding that the government was justified in "imposing reasonable restrictions" because "disruption of the orderly conduct of public meetings is indeed one of the 'substantive evils that [the government] has a right to prevent.'" (quoting *Schenck v. United States,* 249 U.S. 47, 52 (1919))). The Board Members and McKnight expected a robust turnout, a sound prediction given the increased attention paid to this hot-button issue. *See* ECF No. 1 ¶¶ 53, 55–56, 58, 62. Consequently, the School Board's need to cap the number of in-the-building attendees for "safety" reasons seems evident. *See id.* Moreover, the School Board provided a space for people to assemble at the Carver Center in proximity to the meeting itself and publicly broadcasted the open portions of the meeting. *See id.* ¶ 62. From this, the Complaint fails to make plausible that the limitations placed on attendance for safety reasons had been "unreasonable." *See Rose*, 19 F.4th at 635.

In response, Plaintiffs press that the Court must view the School Board meeting as "a designated public forum," with greater scrutiny afforded to any First Amendment restrictions. *See White Coat Waste Project*, 35 F.4th at 196 (designated public fora provide the same protections as public fora). But even if the Court construes the forum as Plaintiffs desire, the claim still fails. In a designated public forum, the government can impose content-neutral and reasonable restrictions on the time, place, and manner of protected activities. *Sammons v. McCarthy*, 606 F Supp. 3d 165, 210 (D. Md. 2022) (citations omitted). For a content-neutral time, place, and manner restriction to pass muster, the restriction must be (1) "justified without reference to the content of the regulated speech"; (2) "narrowly tailored to serve a significant

governmental interest"; and (3) "leave open ample alternative channels for communication of the information" that the speaker wishes to communicate. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quoting *Clark*, 468 U.S. at 293); *see also Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983).

"The principal inquiry in determining content neutrality, . . . in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Alive Church of the Nazarene, Inc. v. Prince William Cnty., Va.*, 59 F.4th 92, 110 (4th Cir. 2023). Moreover, "[t]he requirement of narrow tailoring is satisfied 'so long as the . . . [restriction] promotes a substantial government interest that would be achieved less effectively absent the ordinance.'" *Id.* (quoting *Ward*, 491 U.S. at 799). That said, the restriction need not be the "'least restrictive or least intrusive means' of promoting its goal." *Id.* Rather, "a substantial portion" of the burden on assembly must advance the restriction's goals. *Id.* (quoting *Am. Legion Post 7 of Durham, N.C. v. City of Durham*, 239 F.3d 601, 610 (4th Cir. 2001)).

When viewing the Complaint most favorably to Plaintiffs, no facts make a content-based-restriction on association plausible. *See* ECF No. 1. First, the justification for limiting the number of in-person attendees—safety—bore no relation to the content of the expected speech. *See id.* ¶ 62; *Alive Church of the Nazarene*, 59 F.4th at 110. In other words, the limitations were imposed because of the number of anticipated attendees, not what any were planning to say. *See* ECF No. 1 ¶ 62. Second, the restrictions were narrowly tailored to maintain public safety. *See Alive Church of the Nazarene*, 59 F.4th at 110. While the number of persons inside the building were limited, online access to view the meeting was unlimited. *See* ECF No. 1 ¶ 62. Last, Defendants provided Plaintiffs and the public a separate in-person area, close to the meeting

14

itself, for peaceful protest and an opportunity to exchange different ideas and views.  *See id.* ¶¶ 62, 66.

Plaintiffs, for their part, press that the restrictions must be read as content-based because Defendants could have limited access to the meeting in other facially neutral ways, such as by allowing in person attendance on a first-come-first-served basis.  *See* ECF No. 42 at 15.  But simply because Defendants chose one constitutionally acceptable approach over another does not mean the chosen restriction is unconstitutionally overbroad.  *See Alive Church of the Nazarene*, 59 F.4th at 110.  Where, as here, the restriction is content neutral and narrowly tailored to meet the stated safety concerns, while also providing online access and an alternative on-grounds meeting space, the claim fails.  *See id.*  Count I must be dismissed.[8]

### 3.      Open Meetings Act Claim (Count II)

The Court next turns to the damages claim against the School Board for violations of Maryland's Open Meetings Act, Md. Gen. Provis. § 3-101 *et seq.*  The Open Meetings Act requires that "[w]henever a public body meets in open session, the general public is entitled to attend."  Md. Gen. Provis. § 3-303(a).  Defendants principally argue that as a state agency, the School Board is immune from citizen suits in federal court pursuant to the Eleventh Amendment to the United States Constitution.  ECF No. 35-1 at 26.  Clearly, the Eleventh Amendment affords state agencies this protection, *see Gilliland v. Bd. of Educ. of Charles Cnty.*, 526 F. App'x 243, 245 (4th Cir. 2013) (citing *Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974); *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70–71 (1989)).  Absent a state's consent or waiver of such protection, a state cannot be hauled into federal court to respond to a citizen suit.  *See Gilliland*, 526 F. App'x at 245.  This protection applies to Maryland school boards and their

---

[8] Because the Court dismisses Count I on the merits, it declines to reach Defendants' qualified immunity argument.  *See* ECF No. 35-1 at 17–24.

agents.  *Id.* at 245–46 (quoting *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997);

citing *Lee–Thomas v. Prince George's Cnty. Pub. Sch.*, 666 F.3d 244, 248 n.5 (4th Cir. 2012)).

Plainly, the School Board is a state agency which enjoys Eleventh Amendment immunity.

*See Gilliland*, 526 F. App'x at 247.  Moreover, nothing suggests that the state waived such

immunity in the Open Meetings Act itself.  *See* Md. Gen. Provis. § 3-101 *et seq.*  Nor has the

School Board consented to this suit.  *Cf. Lapides v. Bd. of Regents of Univ. Sys. of Georgia*, 535

U.S 613, 619 (2002) (finding waiver where state removed case from state court to federal court);

*Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238 (1985) ("if a State waives its immunity

and consents to suit in federal court, the Eleventh Amendment does not bar the action.").

Accordingly, the School Board cannot be sued for an Open Meetings Act violation in this Court.

Count II is dismissed.[9]

### 4.    First Amendment Claim:  @MCPS_StaffPride X Account (Count III)

As to Count III's individual capacity claims against the Pride Members based on

blocking Mandel from accessing the @MCPS_StaffPRIDE X account, Defendants contend this

claim fails because no facts make plausible that the Pride Members were acting "under color of

state law."  ECF No. 35-1 at 30–34.  Alternatively, Defendants maintain they are qualifiedly

immune from suit.  *Id.* at 35–38.  The Court takes each argument in turn.

Defendants correctly point out that liability under Section 1983 attaches only to persons

acting "under color of law."  42 U.S.C. § 1983 ("[e]very person who, under color of any statute,

ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any . . . person . .

---

[9]  Plaintiffs pay no real attention to the Eleventh Amendment in their response, but spill much ink urging the Court to exercise supplemental jurisdiction over the claim pursuant to 28 U.S.C. § 1367.  *See* ECF No. 42 at 21–22.  The Supreme Court, however, has made clear that the Court cannot invoke supplemental jurisdiction over claims that are otherwise barred under the Eleventh Amendment.  *See Raygor v. Regents of Univ. of Minn.*, 534 U.S. 533, 541–42 (2002).

. to the deprivation of any rights."). Liability only extends to a private individual when the individual's conduct is so closely tied to state action such that it may be "fairly treated as that of the State itself." *Mentavlos v. Anderson*, 249 F.3d 301, 318 (4th Cir. 2001) (quoting *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999)); *see also Davison v. Randall*, 912 F.3d 666, 679–80 (4th Cir. 2019) (quoting *Holly v. Scott*, 434 F.3d 287, 292 (4th Cir. 2006)), *as amended* (Jan. 9, 2019).

In the First Amendment context, a defendant acts on behalf of the state if she "(1) possessed actual authority to speak on the State's behalf on a particular matter, and (2) purported to exercise that authority when speaking in the relevant social-media posts." *Lindke v. Freed*, 601 U.S. 187, 198 (2024). The "state action doctrine demands a fact-intensive inquiry," *id.* at 197, because the "distinction between private conduct and state action turns on substance, not labels," *id.* at 188. To make plausible state action, the complaint must aver that the defendant has actual authority to speak on behalf of the state, and that there is some tie "between the [defendant's] authority and 'the gravamen of the plaintiff's complaint.'" *Id.* at 188–89. Regarding actual authority, some facts must show that a defendant's authority stems from the law or "longstanding custom." *Id.* at 200. And as to whether the official "purported to exercise" any authority, the Court considers the "appearance and function of the social-media activity." *Id.* at 198.

With this standard in mind, Plaintiffs plausibly aver that the Pride Members are state actors with actual authority to speak on behalf of MCPS on issues that matter to the LGBTQIA+ staff and community. *See* ECF No. 1 ¶¶ 112–24. First, the Pride Members, via the Pride Account, identified themselves with MCPS in several ways. They named the account "@MCPS_StaffPRIDE," *see id.* at 15 n.2, and its managers, the Pride Members, are identified

17

via MCPS emails, *see id.* ¶ 72.  The Pride Account also describes itself as a "safe, affirming professional & social network for MCPS staff who identify as part of the LGBTQIA+ community," and touts as one of its main goals the provision of "[r]esources and reminders for MCPS schools & offices."  *See id.* ¶ 71.  Moreover, the Pride Account is linked via the MCPS website's Staff Affinity Page.  *See id.* ¶ 73.  Taking these facts in the light most favorable to Plaintiffs, the Pride Members have authority to speak on behalf of MCPS as to matters concerning the LGBTQIA+ staff and community.  *See Lindke*, 601 U.S. at 198.

The Complaint further makes plausible that the Pride Members exercised official authority to speak on behalf of MCPS about LGBTQIA+ issues generally and pertaining to the opt-out policy.  *See* ECF No. 1 ¶ 75; *see Lindke*, 601 U.S. at 204 ("[b]ecause blocking operated on a page-wide basis, a court would have to consider whether [the defendant] had engaged in state action with respect to any post on which [the plaintiff] wished to comment.").  In addition to conversations about the LGBTQIA+ curriculum, the platform also discussed gender-inclusive restroom signs at MCPS schools, and support for LGBTQIA+-inclusive school events.  *See* ECF No. 1 ¶ 75.  The Pride Account also included commentary relevant to the opt-out controversy. *See id.*  As pleaded, the Pride Members were not only cloaked with MCPS authority but exercised that authority when they blocked Mandel from the Pride Account.  *See Lindke*, 601 U.S. at 198.  Count III, therefore, survives challenge.

Alternatively, Defendants contend that even if the claim is plausible, they nonetheless enjoy qualified immunity from suit.  ECF No. 35-1 at 35–38.  Government officials sued in their individual capacities are entitled to qualified immunity where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *accord Pritchett v. Alford*, 973 F.2d

307, 312 (4th Cir. 1992). The doctrine of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

The qualified immunity inquiry is two-fold. The Court must consider first whether the facts established by the plaintiff "make out a violation of a constitutional right," and second, "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232 (quoting *Saucier v. Katz*, 533 U.S. 194, 194 (2001)). The Court must undertake this inquiry viewing the facts "in the light most favorable to the party asserting the injury." *Mansoor v. Trank*, 319 F.3d 133, 137 (4th Cir. 2003) (internal quotations and citation omitted). The Court maintains the discretion to address the two prongs "in the order that would best facilitate the fair and efficient disposition of the case." *Atkinson v. Godfrey*, 100 F.4th 498, 504 (4th Cir. 2024) (citing *Pearson*, 555 U.S. at 231).

As for whether any constitutional right is clearly established, the Court must assess if the contours of the right "are sufficiently clear that 'a reasonable official would understand that what he is doing violates that right.'" *Carroll v. Carman*, 574 U.S. 13, 16 (2014) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Whether the claimed violation is "clearly established" must be viewed from the perspective of the law in place at the time of the alleged misconduct. *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (internal quotations and citation omitted); *Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999); *see also White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam).

A claim for a violation of the First Amendment right to free speech proceeds under the same analysis as that for freedom of association. *See St. Michael's Media, Inc. v. Mayor & City*

*Council of Baltimore*, 566 F. Supp. 3d 327, 375–76 (D. Md. 2021), *aff'd*, 21-2158 2021 WL

6502219 (4th Cir. Nov. 3, 2021), *and aff'd*, 21-2206 2021 WL 6502220 (4th Cir. Nov. 13, 2021)

("The same forum-based standards, discussed for the free speech claim, apply to assembly

claims." (citing *Lavite v. Dunstan*, 932 F.3d 1020, 1028–31 (7th Cir. 2019)); *Green v. City of

Raleigh*, 523 F.3d 293, 297, 300–07 (4th Cir. 2008))).  Accordingly, as with the freedom of

association claim, the Court considers the same three elements:  whether the Complaint plausibly

alleges that the plaintiff's speech received First Amendment protection; "the nature of the

forum" in which the claimed violation occurred; and whether the government's justifications as

plead in the Complaint "satisfy the requisite standard" for "exclusion from the relevant forum."

*Rose*, 19 F.4th at 635.

Considering the Complaint facts most favorably to Mandel, the First Amendment claim is

plausibly averred.  *See* ECF No. 1 ¶¶ 112–24.  As to the first element, clearly the right to "voice

dissent from government policies" is protected.  *Tobey v. Jones*, 706 F.3d 379, 391 (4th Cir.

2013) ("A bedrock First Amendment principle is that citizens have a right to voice dissent from

government policies." (citation omitted)).  Mandel was a well-known and vocal opponent to the

Pride Group's position on LGBTQIA+ issues concerning MCPS since November of 2022.  *See*

ECF No. 1 ¶ 76.  From November 2022 to June 2023, Mandel posted her views often on X,

sometimes tagging @MCPS directly, in which she specifically disagreed with the School

Board's refusal to implement an opt-out alternative.  *See id.*

Next as to the type of forum involved, the parties disagree over whether the Pride

Account was a public or nonpublic forum.  *See* ECF No. 35-1 at 35–37; ECF No. 42 at 33.  The

Court need not resolve this debate however, because regardless, the Complaint makes plausible

that the Pride Members denied Mandel access based on the *content* of her speech, an act

prohibited in either forum.  *See Child Evangelism Fellowship of S.C.*, 470 F.3d at 1067 n.2

(viewpoint discrimination is prohibited in all forums); *Goulart*, 345 F.3d at 248–49 ("[t]he

government 'can restrict access to a nonpublic forum as long as the restrictions are reasonable

and are not an effort to suppress merely because public officials oppose the speaker's view.'"

(quoting *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677–78 (1998))); *Steinburg*,

527 F.3d at 386 (same).  In the wake of Mandel's open criticism of the MCPS LGBTQIA+

policies, the Pride Members blocked Mandel from sharing, commenting on, or even viewing

posts on the Pride Account.  *See* ECF No. 1 ¶ 75.  Mandel was iced out while others who shared

the Pride Members' views and supported the MCPS policies were not similarly restricted.  *See*

*id.*  Because the Complaint makes plausible that Mandel was blocked because of her viewpoint,

the Complaint alleges a clear First Amendment violation.  *See Child Evangelism Fellowship of*

*S.C.*, 470 F.3d at 1067 n.2.

   The Pride Members argue that nonetheless immunity applies because the claimed

constitutional violation had not been clearly established at the time that they denied Mandel

access to the Pride Account.  *See* ECF No. 35-1 at 37–38.  The Court is loath to credit an

argument that flies in the face of binding precedent available to Defendants at the time.  *See*

*Randall*, 912 F.3d at 679–80; *see also Sammons*, 606 F. Supp. 3d at 210 (denying qualified

immunity at dismissal because plaintiff plausibly alleged that "defendants violated his right to

publish comments on a public official's social media site because he expressed a view that

defendants did not like" and "[v]iewpoint discrimination by the government has long been found

to be unlawful." (citation omitted)).  *Davison v. Randall* stands for the proposition that public

officials violate an individual's free speech right by blocking access to media accounts because

of the individual's expressed viewpoints.  912 F.3d at 679–80.  Indeed, at the time, even MCPS

21

acknowledged as much when it prohibited the blocking of user access to stay "[i]n alignment with recent court decisions."  *See* ECF No. 1 ¶ 78; Best Practices for Employees.  Because it appears well-settled that alleged viewpoint discrimination amounts to a clearly established First Amendment violation, the Pride Members are not entitled to qualified immunity.  *See Caroll*, 574 U.S. at 16.

The Court recognizes, of course, that discovery will add important factual context to the allegations.  *See Sammons*, 606 F. Supp. 3d at 210.  Accordingly, the Pride Members are free to reassert qualified immunity at the summary judgment stage.  For now, however, the motion as to Count III is denied.

## III.    Dismissal With or Without Prejudice

Last, the Court turns to whether dismissal of claims will be with or without prejudice. *See Weigel v. Maryland*, 950 F. Supp. 2d 811, 825–26 (D. Md. 2013).  Generally, when a plaintiff has not been afforded an opportunity to amend the complaint, dismissal should be without prejudice.  *See Glover v. Loan Science, LLC*, No. 8:19-01880-PWG, 2020 WL 3960623, at *3 (D. Md. July 13, 2020) (citing *Adams v. Sw. Va. Reg'l Jail Auth.*, 524 F. App'x 899, 900 (4th Cir. 2013)).  However, when the claims suffer from legal defects that simply cannot be cured, dismissal with prejudice is warranted.  *See Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 630 (4th Cir. 2008).

As for Count I, because the Court dismisses the injunctive and declaratory relief claims for lack of standing, the dismissal must be without prejudice.  *See Adams Outdoor Advert. Ltd. P'ship v. Beaufort Cnty.*, 105 F.4th 554, 566 (4th Cir. 2024) (quoting *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 185 (4th Cir. 2013)); ECF No. 1 ¶¶ 81–104.  And as to the individual capacity claim for money damages in Count I, it

will be dismissed without prejudice as well to afford Plaintiffs an opportunity to cure the pleading defects, if possible. *See* ECF No. 1 ¶¶ 81–104.  But as to the official capacity claims for Counts I and III, the dismissal will be with prejudice. *See Does 1-22*, 644 F. Supp. 3d at 157. Last, the Open Meetings Act claim in Count II is dismissed without prejudice so that Plaintiffs can pursue the claim in state court if they choose. *See Gilliland*, 526 F. App'x at 245–46.

## IV.    Conclusion

Based on the foregoing, Defendants' motion to dismiss is granted in part and denied in part.  A separate Order follows.

  September 17, 2024
_____
Date

  /s/
_____
Paula Xinis
United States District Judge